UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| BRASS REMINDERS CO., INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Civil Action No. 5: 19-243-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| RT ENGINEERING CORP., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant/Counter-Plaintiff. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant and Counter-Plaintiff RT Engineering Corp. ("RT" or "the defendant") has filed a motion for summary judgment requesting judgment as a matter of law on all claims asserted in this action.  [Record No. 21]  Specifically, RT requests that the Court dismiss Plaintiff and Counter-Defendant Brass Reminders Co., Inc.'s ("Brass Reminders" or "the plaintiff") breach of contract and Kentucky Consumer Protection Act ("KCPA") claims while granting summary judgment on the defendant's breach of contract counterclaim for the outstanding contract price.  RT argues in the alternative that the contract at issue precludes Brass Reminders from seeking consequential damages.  Having considered the matter, the Court agrees that summary judgment is appropriate.  Summary judgment will be entered in favor of RT on all counts.

## I.  Background

Brass Reminders is incorporated in Kentucky with its principal place of business in Keene, Kentucky.  [Record No. 1-1] The plaintiff business almost exclusively manufactures

decals for colleges and tourist souvenir shops around the country.  [Record No. 21-3, pp. 2-3]
Brass Reminders is owned by its president, Brent Durham, and his wife.  [*Id.* at p. 2]

RT is incorporated in Massachusetts with its principal place of business in Franklin, Massachusetts.   [Record No. 1, p. 3]  The defendant, *inter alia*, manufactures custom automation systems.  [Record No. 21-4, p. 2]

Brass Reminders has traditionally packaged its decals by hand.  [Record No. 21-3, p. 5]  The decal and "a consistent size[d] piece chipboard" (a piece of cardboard providing some rigidity to the package) are placed into a clear bag.  [*Id.*]  Then, Brass Reminders staples a cardboard header card onto the bag to seal off the product and complete the packaging.  [*Id.*]

Durham initially contacted RT in 2014 about the possibility of contracting for a custom automated decal packaging machine.  [*Id.* at p. 9]  But Durham decided not to order a machine in 2014 and lost contact with RT.  [*Id.*]  Durham again contacted RT about the possibility of building a custom automated decal packaging machine in April 2016.  [*Id.* at p. 10]

RT then provided Brass Reminders with a Quote dated May 18, 2016, proposing terms of an agreement and the course of the project going forward.  [Record No. 21-6]  The Quote estimates that the project would cost $279,083.00, with 40% due with the placement of an order.  [*Id.* at p. 11]  The other payment deadlines provided by the Quote are: 25% of the cost due upon completion of design review,  20% upon start of assembly, 10% upon completion of the Factory Acceptance Testing ("FAT") (several days of on-site testing and demonstrations of the completed machine at RT's facility prior to acceptance of the finished product), and 5% due after acceptance of the product.  [*Id.* at pp. 10-11]  The project was estimated to take 24 weeks between the date the parties agree to a Functional Specification Document ("FSD") that provides more details about the design and build criteria for the machine and the date of the

FAT at RT's Massachusetts site.  [Record Nos. 21-6, p. 11 and 21-14, p. 3]  The Quote's Table

of Contents and final page designate RT's Terms and Conditions as "Item P" of the document.

[Record No. 21-6, pp. 3, 15] Item P states, "[s]ee our website for 2016 Terms [and] Conditions"

and includes a hyperlink to the Terms and Conditions.  [*Id.* at p. 15]

The Terms and Conditions listed on RT's website in 2016 generally account for terms

that would govern RT contracts absent or in addition to terms provided in project proposals

like the Quote in this case.  [Record No. 21-7] A section of this document is dedicated to

"delivery, delay, changes in scope, [and] customer responsibility."  [*Id.* at pp. 3-5]  As relevant

here, that section states:

> Seller reserves the right to modify the scheduled delivery of Product based upon
> changes in scope [and] delays in Customer response . . . . Changes to the scope
> of work may affect pricing of the system and/or the system delivery schedule .
> . . . Customer shall assign a contact that will be responsible for interfacing with
> Seller, answering questions, and promptly obtaining information and samples
> when required.  Delays in response to Seller requests will result in delays in the
> delivery of the Product.  Customer will be responsible for providing engineering
> drawings and sample parts during the design, debug, and testing phases of the
> project.  Sample parts and documentation furnished will need to be a true and
> complete representation of the product to be processed with the Seller's
> equipment.  Typical parts and tolerances or variations of the parts need to be
> identified.  This will ensure that the Product is designed to accommodate the
> variances from part to part and to include the control features . . . . Specifically,
> dimensional tolerances of each product shall be provided along with all process
> specifications which will in any manner effect the performance of the Seller's
> equipment . . . . Failure on the part of Customer to meet any of its responsibilities
> may lead to delays in RT Engineering's performance or [its] inability to
> perform, for which RT Engineering will not be responsible.[1]

[*Id.* at pp. 4-5]  The Terms and Conditions also notably provide that "[t]his Agreement applies

to any orders submitted by Customer in response to any Proposal from RT Engineering.  Any

---

[1]     "Tolerance" refers to the "the allowable deviation from a standard" and "the range of
variation permitted in maintaining a specified dimension in machining a piece."  *Tolerance*,
https://www.merriam-webster.com/dictionary/tolerance (last visited May 21, 2020).

additional or differing terms and conditions on Customer's Purchase Order do not apply unless expressly agreed to in writing by RT Engineering, signed by the President."  [*Id.* at p. 1] Additionally, the Terms and Conditions relevantly exclude liability for "special, indirect, consequential, incidental, or punitive damages."  [*Id.* at p. 7]

RT sent Brass Reminders a May 20, 2016 invoice requesting payment of 40% of the project's estimated cost with the placement of a purchase order for the decal packaging machine.  [Record No. 21-8]  Durham responded with a purchase order and tendered the payment shortly thereafter.  [Record No. 21-9]  Importantly, the purchase order reflected the payment schedule and delivery terms of the Quote but added "[d]elivery and install ASAP, within 2016 calendar year."  [*Id.*]

The parties held a project "on-boarding meeting" over the phone on June 8, 2016.  After that meeting, Durham executed a Customer Introduction Agenda document that again referenced the Terms and Conditions on RT's website.  [Record No. 21-11]

Darren LaBonne, RT's lead mechanical design engineer on the decal packaging machine project, then emailed Durham on June 28, 2016, requesting information previously discussed at the on-boarding meeting necessary for the completion of the forthcoming FSD. [Record No. 21-12]  Durham responded on June 29 with dimension specifications for various sizes of decals, chipboards, and header cards that were to be packaged by the machine.  [Record No. 21-13]  He had previously represented to RT that he was familiar with automation and its tolerancing and dimensioning.  [Record Nos. 21-3, p. 11 and 21-4, p. 12]  However, he did not provide any information about materials' variances other than the general measurements of the materials used to package decals of different sizes.  [Record No. 21-13]  Durham signed the FSD on July 8, 2016.  [*Id.* at p. 10]

- 4 -

Changes to the decal packaging machine's function pushed the project into 2017. [Record Nos. 21-16 and 21-17] Due to the delay, the parties arranged a December 2016 factory test on one size of decals for tax purposes. [Record Nos. 21-3, pp. 27-28, 21-18, and 21-19] They began to prepare for a formal FAT in January 2017, and RT reached out to Durham to obtain all the "sizes and style parts" for the packaging and decal materials prior to completion of the project. [Record No. 21-20] LaBonne followed up in a February 27, 2017 email that noted:

> The parts that were originally brought the last time you were here [in December 2016] and some of the parts sent after have issues the machine cannot process. If the chip boards are severely bowed they will not feed through the friction feeders. Also we noticed that the board materials vary and the print quality suffers. Some of the boards are more porous and absorb the ink. This causes a blurred print. The header cards must have the tabs intact in order for the friction feeders to be able to singulate them properly also.

[Record No. 21-21] LaBonne testified that the material samples Brass Reminders provided to RT during the summer and early fall of 2016 varied from these later samples. [Record No. 21-4, p. 30]

LaBonne then noted in a March 20, 2017 email to Durham that "[w]e have been dealing with material issues right along and it is really slowing down progress." [Record No. 21-22] Further, the March 20 email stated that some of the problems with the materials supplied by Brass Reminders to RT likely stemmed from the fact that it had been affected by humidity of their prior storage in Brass Reminders' non-climate-controlled facility. [Record No. 21-23]

Durham acknowledged in a March 23, 2017 email to LaBonne that Brass Reminders had previously used "all gauges of material," which did not matter for hand packaging but affected the function of the automated machine. [Record No. 21-23] LaBonne also testified that Durham had indicated that Brass Reminders had used poor-quality materials in the past

because their quality or inconsistent dimensions did not affect the hand-packaging process. [Record No. 21-4, p. 20]  This inconsistency was, at least in part, due to the fact that Brass Reminders' materials were mostly shear cut rather than die cut.  [*Id.* at pp. 20-21]  Shear cut materials are placed against a stop and sheared by a blade, and they have inconsistent dimensions and undesirably angled edges if their cutter does not place them exactly flush against the stop.  [*Id.* at p. 21]  Additionally, shear cutting may fail to completely cut materials, a problem evident in some materials Brass Reminders provided to RT.  [*Id.*]  Die cutting, albeit more expensive, provides more precise and consistent dimensions.  [*Id.*]

Durham did not believe that Brass Reminders was responsible for complications arising from the quality and variances of its materials during this "debugging" process.  He stated that he "knew [his] product was not consistent" but had initially proposed specifications that he thought would work and "handle all the variability" while accepting input from RT because he is not an engineer.  [Record No. 24-1, p. 2]  He also testified that, "[d]oing this to help them – [*e.g.*,] ordering [] consistent thickness cardstock to help them –[] yes those cost me a little bit . . . but – you know, at some point, I can't keep changing my products to make a machine that's not doing the job it was contracted to do.  I expected them to solve the problems." [Record No. 21-3, p. 29]

Problems with the packaging materials persisted despite the parties' attempted fixes. The parties held an unsuccessful FAT in June 2017.  [*Id.* at pp. 34-35]  Some of the problems with the machine appear to have been caused by static resulting from the storage of packaging materials stored in the humid conditions at RT's facility, which attempted to simulate the non-climate-controlled conditions of Brass Reminders' Kentucky facility.  [Record No. 21-4, pp. 9-11]  Similarly, LaBonne stated that the machine itself started to "sweat" due to humidity.

[*Id.* at p. 10]   However, he testified that RT fixed the humidity problems inherent in the machine by applying Teflon tape.  [*Id.*]

RT continued in its efforts to fix all problems with the machine's function, but the manufacturer could not overcome the problems associated with dimensional variances of the low-quality materials Brass Reminders provided as samples of those it used to package decals. LaBonne testified that the original small sample batches Brass Reminders supplied to RT did not problematically vary from the dimensional specifications of materials for packaging the decals.  [*Id.* at p. 7]  The variances began to become a problem as more materials were supplied to RT so that it could try to simulate the rapid automated package output desired by Brass Reminders (500 units per hour).  [*Id.* at p. 14]  A related and recurring issue was the tendency of the materials to curl into the shape of a potato chip, making them difficult to be feed into the machine.  [*Id.*]

Accordingly, RT informed Brass Reminders in September 2017 that there would be some "downtime" in output when the machine had to adjust for "product variation or product inconsistency."   [Record Nos. 21-3, p. 40 and 21-29]   Additionally, RT had to disassemble and redesign some parts of the machine to accommodate a new staple location on the package's header at Brass Reminders' request.  [Record No. 21-4, pp. 17-18]  Nevertheless, RT requested new decal and packaging materials in November 2017 to prepare for a final FAT, specifying that "[p]arts must be of production quality so we don't run into any further part related issues." [Record No. 21-30]   Durham responded and shipped materials on January 16, 2018, and February 18, 2018.  [Record No. 21-32]

Upon receiving all materials for a final FAT, RT sent Durham an email with photographs of the materials that had arrived. [Record No. 21-36] RT followed up with an email regarding the materials received, stating:

> [a]s you can see from the photos, the [decal] material is substantially curled and not to [specification]. We could accommodate for much of this curl if it was consistent but as some are bowed and others are potato chip in the bend, we cannot find a single solution to accommodate all of these out of spec[ified] conditions . . . .

[Record No. 21-37, p. 2] Durham responded:

> We changed the way we cut the decals so that they were all the same size to help with [the machine's] feeders, but you were originally tasked to load decals of any size and shape, like the samples you were sent . . . . The slight curve is the way these are, and they cannot be changed. Your job was to create a machine that can insert them.

[*Id.* at p. 1]

The parties then conducted a final FAT in May 2018. The test was largely successful, but the dimensions of some of the materials were greater than the dimensions specified by Brass Reminders at the onset of the project and the inconsistencies caused the machine to jam. [Record Nos. 21-3, p. 45, 21-4, pp. 4, 20, and 21-40] The decals also began to curl, and the porosity of the bags used to package them caused problems . [Record Nos. 21-3, p. 45 and 21-4, p. 13] LaBonne testified that the only significant problems remaining after this test were the materials' inconsistent dimensions and the fact that they curled and changed in shape as they were fed into the machine. [Record No. 21-4, p. 23] Durham corroborated this, in part, in a May 23, 2018 email to the company that cut some of its packaging materials, stating, "[w]e have not discussed this yet, but at the last trial, variation in the size of the backer cards from shearing became an issue. We need to look at die cutting the backer cards for consistency. I am not sure why [RT] ha[s] such precise requirements." [Record No. 21-40]

Brass Reminders refused to accept the machine as a finished product at the conclusion of the May 2018 FAT.  RT offered to buy die cut materials from the plaintiff's cutting company at its own expense to prove that the machine could run smoothly and package 500 decals per hour if the packaging materials actually complied with their specifications.  [Record No. 21-4, p. 5]  Durham refused, and instructed the cutting company to decline to sell die cut materials directly to RT because "the machine had to prove itself out on the actual parts that we were going to be using to package with it."  [Record No. 21-3, pp. 46-47]

Durham subsequently reported to RT that die cutting header cards would prohibitively increase Brass Reminders' costs by $70,000.00 per year in June 2018.  [Record No. 21-42]  In the same email, he stated that he spoke with the cutting company about tolerances of the shear cut cards.

> Keep in mind that because we hand insert these, we did not [previously] specify tolerances because it simply did not matter to us.  [The cutting company] assure[s] me that if they are careful, they think they can come very close to 1/32 [inches], which is what you have for a tolerance in your spec[ifications] for the cards.

[*Id.*]

Communications between the parties broke down.  Durham shipped new supplies to RT for testing in early July, but RT misplaced them and did not respond until after Durham followed up in November 2018.  [Record No. 21-44]  Durham requested termination of the decal packaging machine project and a full refund of the $235,331.25 that he had already paid RT.  [Record No. 21-43]  RT stated that the machine should be able to process 92.5% of the materials shipped to it and countered that it would either: (1) test those materials, ship the machine after a successful test, and credit the outstanding purchase order balance on due to the

undue delay; or (2) ship the machine as is to Brass Reminders for Durham to test locally and credit the outstanding balance.  [Record No. 21-44]

Durham did not accept either option, and Brass Reminders filed suit in Jessamine Circuit Court on May 23, 2019.  [Record No. 1-1]  He alleges one count of breach of contract and one count of violation of the KCPA.  [*Id.*]  RT removed the case to this court on June 6, 2019, and asserted a counterclaim for breach of contract and payment of the outstanding contract price.  [Record Nos. 1 and 5]  RT has provided the affidavit of its president who indicates that Brass Reminders owes the defendant $40,659.75 under the contract.  [Record No. 21-46]

## II.  Standard of Review

Summary judgment is appropriate where there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247-48 (1986).  The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52; see *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The moving party bears an initial burden of production, and "[o]nce the moving party has met its burden [], 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986)).  "The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims."  *Clark v. Teamsters Local Union 651*, 349 F. Supp. 3d 605, 615 (E.D. Ky. 2018) (citing *Celotex*, 477 U.S. at 324).  The Court considers all facts and inferences drawn from the facts in the light most favorable to the nonmoving party.  *Matsushida Elec. Indus. Co.*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.  Terms of the Contract

#### A.  Applicable Law

The Court notes at the outset that there appears to be a disagreement regarding which state's contract law governs the breach of contract claims.  RT asserts that Massachusetts law controls because the Terms and Conditions provides that "[t]his Agreement shall, in all respects, be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., excluding its conflicts of laws principles."  [Record Nos. 21-1, p. 22 n. 10 and 21-7, ¶ 14]  Brass Reminders seems to dispute this point, although it is difficult to ascertain its exact position because it does not cite to any law in its response apart from the summary judgment standard of review.  [Record No. 23]

That said, a major point of contention is whether the Terms and Conditions, which includes the choice of law clause, is a part of the contract.  If the Terms and Conditions are not a part of the contract, its choice of law clause would be unenforceable. Thus, the clause does not inform an analysis of what terms are part of the contract in this case.

"When determining which state's substantive law to apply, federal courts sitting in diversity look to the conflict of laws rules in the forum state, in this case, Kentucky."  *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010) (citing *Hayes v.*

*Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001)) (citations omitted).   When applying Kentucky's choice of law rules, "a strong preference exists in Kentucky for applying Kentucky law."   *Id.* (citing *Wallace Hardware Co. Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000); *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 230-31 (6th Cir. 1997); *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983)).   Further, a full choice of law analysis is only necessary where two states' laws are in conflict.   *Id.*   (citing *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005)).   When the applicable states' laws are not in conflict and application of either would render similar results, federal courts apply Kentucky law.   *Id.* (noting that the strong presumption in favor of applying Kentucky law "require[s] a significant reason to displace it.").

Here, two states' laws are potentially applicable.   The parties are citizens of Kentucky and Massachusetts, and no portion of their negotiations or performance appears to have occurred in any other state.   However, the terms issue requires a fairly garden-variety Uniform Commercial Code ("UCC") Article 2 analysis.   Kentucky and Massachusetts have essentially adopted the same versions of the relevant Article 2 sections discussed herein.   *Compare* Kentucky Revised Statutes ("KRS") §§ 355.1-103(2), 355.2-104, 355.2-204, 355.2-206, *and* 355.2-207, *with* Massachusetts General Laws Annotated ("Mass. Gen. Laws") ch. 106 §§ 1-103(2), 2-204, 2-204, 2-206, *and* 2-207.

Because the states have adopted nearly identical versions of the UCC provisions relevant to this analysis, there is no conflict and the Court will apply Kentucky law to determine what terms are part of the contract.

## B.  Analysis

"The construction as well as the meaning of a written instrument, however compiled, is a matter of law for the court."  *Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992).  Generally, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  KRS § 355.2-204(1).  "In Kentucky, and unless otherwise unambiguously indicated, an offer to make a contract shall be construed as inviting acceptance in any manner and by any reasonable medium."  *Chrisman Mill Vineyards, Inc. v. Presque Isle Wine Cellars, Inc.*, No. 5:16-CV-190-KKC, 2018 WL 6380765, at *4 (E.D. Ky. Mar. 19, 2018) (citing KRS § 355.2-206(1)(a)).  The parties generally agree that the May 18, 2016 Quote was an offer to form the contract, and they do not dispute that Brass Reminders accepted the contract or that a contract existed.  The dispute arises over what terms were accepted.

RT appears to argue that acceptance occurred on June 8, 2016, when Durham signed the Customer Introduction Agenda, which, like the Quote, references the Terms and Conditions on RT's website.  [Record No. 24, pp. 6-7] The defendant cites Durham's deposition testimony that he understood he was signing a contract when he signed the Customer Introduction Agenda.  [*Id.* (citing Record No. 21-3, pp. 25-26).]

Brass Reminders contends that the Quote and the FSD (signed by Durham on July 8, 2016) define the contractual relationship and terms.  The FSD does not include a reference to the Terms and Conditions.  [*See* Record No. 21-14.]

Brass Reminders accepted the contract earlier than both parties estimate.[2]  The Quote was an offer.  It provides terms documenting the general design of the decal machine, price, project timeline, and procedures for acceptance and shipment of the finished decal machine as well as the disputed hyperlink to the generalized Terms and Conditions.  [Record No. 21-6, pp. 6-15]  The Quote does not unambiguously state a procedure for acceptance of the offer, but it does provide a payment schedule that includes "40% due with placement of the order." [*Id.* at p. 11]  Thus, it contemplates acceptance of the offer through the placement of an order for the decal machine and tender of 40% of the quoted purchase price.  RT sent Brass Reminders an invoice dated May 20, 2016.  Brass Reminders, through Durham, placed a purchase order and tendered the required price.  This was acceptance or the purposes of KRS § 355.206(1)(a), and a contract was formed for the purposes of KRS § 355.2-204(1).

At first glance, the Quote's provisions would seem to be the operative terms of the agreement.  And as RT argues, the Terms and Conditions provided by hyperlink are enforceable terms as well.  The United States Court of Appeals for the Sixth Circuit has generally recognized that "a contracting party has an affirmative duty to familiarize itself with the terms and conditions contained in other documents incorporated by reference."  *Glenn*

---

[2]      In most circumstances, "[t]he question of the existence of a contract is a question of fact for the jury to answer."  *Adiovox Corp. v. Moody*, 737 S.W.2d 468, 471 (Ky. Ct. App. 1987).  And while acceptance generally pertains to the existence of a contract, the fact of acceptance and contract formation is not disputed in this case.  The discussion of acceptance in this opinion therefore serves only to inform the analysis of whether the Terms and Conditions became a part of the contract in this case.  This is a question for the Court.  *See Chrisman Mill Vineyards, Inc.*, 2018 WL 6380765, at *4-6 (determining, on summary judgment, that Terms and Conditions were not incorporated by reference in the agreement where the contract was accepted before the execution of the document in which they were proposed).

*Hunter & Assocs., Inc. v. Union Pacific R.R. Co.*, 135 F. App'x 849, 855 (6th Cir. 2005). And although the UCC as adopted in Kentucky does not describe the propriety of incorporation by reference, the Supreme Court of Kentucky recognizes the common law doctrine of incorporation by reference where there is "clear language [] express[ing] the incorporation of other terms and conditions[.]" *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332, 344 (Ky. 2015) (quoting *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 797 (Ky. App. 1985)) (alterations in original); *see also* KRS § 355.1-103(2) ("Unless displaced by the provisions of the Uniform Commercial Code, the principles of law and equity . . . supplement its provisions."). The Terms and Conditions is noted in the Quote's Table of Contents, and the hyperlink is provided on the final page of the document after the language "[s]ee our website for 2016 Terms [and] Conditions." [Record No. 21-6, pp. 3 and 15] This is clear language incorporating the Terms and Conditions by reference, and Durham or other Brass Reminders personnel had a duty to review these provisions prior to accepting the contract.

Durham's purchase order acceptance includes terms as well. The payment schedule terms and shipment terms mirror those of the Quote. [Record Nos. 21-6, p. 11 and 21-9] However, there is an additional term on this document regarding the delivery date that implicates KRS § 355.2-207's "battle of the forms" provision. KRS § 355.2-207(1) states that a "definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

Brass Reminders' purchase order specifically states: "Delivery and install ASAP, within calendar year required." [Record No. 21-9] The purchase order does not "expressly"

- 15 -

condition acceptance on assent to this delivery-by-the-end-of-2016 term and, therefore, it does not alter the conclusion that the purchase order was an acceptance of the offer.

But this is an additional term that differs from related terms of the Quote.  The Quote measures time for project completion as 24 weeks between the execution of the FSD and the FAT on-site at RT.  [Record No. 21-6, pp. 10-11]  The 24-week deadline for a FAT would have been December 23, 2016, because Durham executed the FSD on July 8, 2016.  The Quote also explicitly states that "delivery may be impacted due to significant changes from the quoted scope of supply or delays in approving the design or [FAT]." [*Id.* at p. 11]  In other words, the offer contemplates complications arising during the manufacturing process and potential dissatisfaction of Brass Reminders during the FAT prior to delivery of the finished product. Unlike the purchase order, the Quote does not specify an ultimate delivery date.

If the parties to a contract are merchants, additional terms in an acceptance become part of the contract unless: "(a) [t]he offer expressly limits acceptance to the terms of the offer; (b) [t]hey materially alter [the offer]; or (c) [n]otification of objection to them has already been given or is given within a reasonable time after notice of them is received."  KRS § 355.2-207(2).  If the parties are not merchants, additional terms are "to be construed as proposals for addition to the contract." *Id.*

Here, the parties are not merchants for the purposes of the UCC. "'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ." KRS § 355.2-104(1).  RT deals in goods of the kind involved in this contract (automated machines like the decal packaging machine).  But Brass Reminders does not appear to deal in such machines, as it does not routinely buy or sell them.  Additionally, there is no indication

in the record that it uses similar automated machines in other parts of its business. The plaintiff also does not hold itself out as a company that has expertise with them even if it planned to use one to package its products. And while Durham may have represented to RT that he was somewhat familiar with automation and its details, the facts of this case indicate that he was actually unfamiliar with the requirements and function of such machines. Assuming Brass Reminders is not a merchant under the circumstances, the term was a proposal that RT did not ratify.

But even if Brass Reminders is a merchant for the purposes of the contract, the additional delivery term likely failed to become part of the contract. The term is arguably a material alteration of the project completion and delivery-related terms of the Quote. "Whether an additional term in the acceptance works a material alteration must be determined in light of the circumstances of each case." *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1204 n. 11 (6th Cir. 1981) (addressing Ohio's "battle of the forms" provision that mirrors that of Kentucky) (citation omitted). The timeliness of RT's work, *i.e.,* its failure to produce a machine that satisfied Durham within two and a half years of contract formation, is at issue in this case. This indicates that a change to the timeline terms of the contract would be material. *See id.* (concluding that a purchase order additional term involving consequential damages liability was a material alteration where the parties "hotly disputed" damage liability).

Additionally, the Terms and Conditions incorporated by reference in the Quote expressly foreclosed the ability of Brass Reminders to include additional terms without RT's assent. The Terms and Conditions state: "This Agreement applies to any orders submitted by Customer in response to any Proposal from RT Engineering. Any additional or differing terms and conditions on Customer's Purchase Order do not apply unless expressly agreed to in

- 17 -

writing by RT Engineering, signed by the President." [Record No. 21-7, p. 1] This provision may condition acceptance of the offer to the terms of the Quote and Terms and Conditions absent any indication to the contrary by RT. *See* KRS § 355.2-207(2)(a). But it certainly gives notice of objection to additional terms absent RT's explicit agreement. *See* KRS § 355.2-207(2)(b). The additional term of Durham's purchase order contradicts this provision, and as it does not appear that RT consented to it, it is likely not a part of the contract at issue in this case if the parties are both merchants.

The time and manner of offer and acceptance in this case indicate that the Quote validly incorporated the Terms and Conditions by reference. In addition to the terms of the Quote, the Terms and Conditions became the terms of the contract at its inception. And the additional delivery date term included in Durham's acceptance of the offer did not become a part of the contract under KRS § 355.2-207.

## IV.  Breach of Contract and Damages

### A.  Applicable Law

The remainder of the contract-claim related issues concern breach and damages. Having determined that the Terms and Conditions are, in fact, terms of the contract in this case, the Court now turns to the choice of law clause included in the Terms and Conditions.

As noted, the choice of law clause indicates that the Court should apply Massachusetts law to the remaining breach of contract issues. [*See* Record 21-7, p. 8] Courts applying Kentucky law have indicated that Restatement (Second) of Conflict of Laws § 187 provides the standard applicable to determine the enforceability of a choice of law provision. *See*, *e.g.*, *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 397 (6th Cir. 2000) ("[W]e conclude that, in a standard commercial breach-of-contract case such as we have here, the Kentucky

courts would choose to adopt § 187 of the Restatement as their analytical framework for addressing a contractual choice-of-law clause."); *Leafguard of Kentuckiana v. Leafguard of Kentucky, LLC*, 138 F. Supp. 846, 854-855 (E.D. Ky. 2015) (finding that § 187 applies to assess choice of law provisions under Kentucky law); *General Elec. Co. v. Martin*, 574 S.W.2d 313, 316 n. 1 (Ky. Ct. App. 1978) (citing, *inter alia*, § 187 to conclude that a choice of law provision was valid "[a]s a matter of Kentucky law") (citations omitted).

Section 187(1) provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Certainly, breach of contract and damages are issues that can be addressed by a choice of law provision such as that of the Terms and Conditions. And under § 187(2), "the court should honor the parties' choice of law unless (1) 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,' or (2) 'application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest.'" *Asher*, No. 06-548-ART, 2011 WL 3104084, at *2 (E.D. Ky. July 26, 2011) (quoting *Wallace Hardware Co.*, 223 F.3d at 398) (internal quotation marks omitted).

Here, the Court will honor the choice of law clause and apply Massachusetts law to the remaining issues. Massachusetts, the chosen state, has a significant relationship to the parties and the transaction. As noted, RT is a Massachusetts corporation, the decal machine was built in Massachusetts, and the FATs were performed by RT and Brass Reminders at RT's Massachusetts facility. Further, there is no indication that application of Massachusetts law would be contrary to a "fundamental policy" of Kentucky law. For example, RT provides

citations to Massachusetts and Kentucky law in support of its motion, which indicates, at least, that outcomes under substantive Massachusetts law on the remaining issues would not violate any "fundamental" policy of Kentucky law and likely suggests that application of Massachusetts law would directly accord with Kentucky law. [Record No. 21-1, pp. 23-24] Finally, Kentucky does not have a "materially greater interest" because Massachusetts has a considerable relationship to RT and the contract in this case.

### B. Analysis

RT contends that Brass Reminders' conduct throughout the course of the decal packaging machine project constitutes a material breach of the contract and entitles it to judgment as a matter of law on the plaintiff's breach of contract claim as well as the defendant's counterclaim. Specifically, it argues that material facts of the case demonstrate that the plaintiff:

> materially breached its contract with RT Engineering by failing to inform RT Engineering of the significant variances in its materials during the design/build phase of the project, as required by the Terms and Conditions, and by continuing to provide throughout materials that were outside of the contract specifications, including the Dimensional Specifications that Brass set.

[Record No. 21-1, p. 22-23] The defendant asserts that it is entitled to judgment on its counterclaim for breach of contract and the outstanding balance of the contract price under the Terms & Conditions because it produced a decal packaging machine that worked according to the parties' deal except for the problems that were caused by Brass Reminders' materials, *i.e.*, the problems that RT believes constitute a material breach on the part of the plaintiff. [*Id.* at p. 25]

Apart from arguing that the Terms and Conditions are not part of the contract between the parties, Brass Reminders essentially responds that there are disputes as to material facts

regarding its conduct. The plaintiff states that deposition testimony demonstrates that the packaging materials Brass Reminders provided to RT were dimensionally consistent throughout the project. [Record No. 23, pp. 3-4] Relatedly, Brass Reminders points out that RT's claims regarding inconsistent materials did not surface until early 2017, after the parties initially tested the machine in December 2016. [*Id.* at p. 6] Additionally, Brass Reminders indicates that the machine itself had humidity problems that contributed to its disfunction. [*Id.* at pp. 6-7] Finally, the plaintiff argues that RT is not entitled to the remainder of the contract price because it never produced a machine capable of consistently packaging 500 units per hour. [*Id.* at pp. 7-8]

As RT indicates in its reply brief [Record No. 24], there is no real dispute regarding the facts at issue on the breach of contract claims. The plaintiff misconceives RT's point about the materials' variances. The deposition testimony cited by Brass Reminders does not indicate that the materials it supplied to the defendant throughout the project were dimensionally consistent and lacked any variances from piece to piece. It only demonstrates that the plaintiff initially provided dimensional specifications for different sizes of packaging materials that correlated with the different sizes of decals it sells. [*See* Record Nos. 23-3, pp. 30-31, 52, 54, 23-4, pp. 21, 41, and 23-6, pp. 8, 25-26, 29.] RT concedes -- and the record demonstrates -- that Durham initially provided the general sizes of materials to be used to package its various sizes of decals. [Record No. 24, pp. 2-4] However, RT contends that the materials provided to the defendant were inconsistent with the dimensional specifications of the various products that the machine was to package.[3] The record indicates that this is true and that it became

---

[3]    To put it another way, the plaintiff appears to be confused by the talk of "variances." RT does not argue that the machine did not need to be able to package "varying" sizes of decals

evident once Brass Reminders began to supply the defendant with larger quantities of sample materials to simulate the machine's desired output in early 2017.  RT does not contest that the early small batches of samples showed no significant variances from the initial dimensional specifications.

RT also does not dispute that the machine started to "sweat" from humidity on one occasion, but points out that problem was quickly resolved by the application of Teflon tape. [Record No. 24, pp. 12-13]  Indeed, the record demonstrates that the other humidity-related problems were due to the materials' susceptibility to the conditions at RT's facility (which was purposefully humid to simulate the condition of Brass Reminders' facility).  And while RT does not appear to dispute that the machine did not produce 500 packaged units per hour when it was tested, the defendant contends that it upheld its obligations under the contract and continually attempted to do so while the defendant breached by not providing consistent materials that the machine could in fact process at the desired rate.  [Record No. 24, p. 15] Therefore, there are no real disputes as to the material facts at issue here.

"Under Massachusetts law, a plaintiff alleging a breach of contract must make four showings: (1) the parties entered into a contract; (2) the plaintiff was ready, willing, and able to perform under that contract; (3) the defendant breached that contract; and (4) the plaintiff sustained damages because of that breach."  *Children's Hosp. Corp. v. George Washington Univ.*, 750 F. Supp. 239, 245 (D. Mass. 2010) (citing *Singarella v. City of Boston*, 342 Mass.

---

under the contract.  Instead, RT complains that the materials were of poor quality and thus actually "varied" from the multiple sizes specified by Brass Reminders at the outset of the project.  And the defendant believes that it is entitled to summary judgment because it was the plaintiff's responsibility to account for such "variances" as well as the tolerances of the materials under the contract.

385, 173 N.E.2d 290, 291 (1961)).  The first, second, and fourth elements of breach of contract are met regarding both parties' claims.  Clearly, a contract was formed.  Both parties were ready, willing, and able to perform.  And both sustained damages.  Brass Reminders alleges damages including the amount of the contract price it has already paid as well as "business and other associated losses and expenses, opportunity costs and other contractual, compensatory, and statutory damages."  [Record No. 1-1, p. 2]  RT seeks the remainder of the contract price, *i.e.,* the $40,659.75 outstanding balance that Brass Reminders did not pay.

Thus, the only element in question is breach, and it is clear based on the record and the incorporation of the Terms and Conditions, that Brass Reminders breached the contract.  As noted, the Terms and Conditions specifically put the responsibility to account for variances and tolerances of materials on Brass Reminders.  The record demonstrates that Durham never accounted for the tolerances of the materials he supplied to the defendant due to the fact that he had not needed to consider this issue when hand packaging decals.

The sample products provided to RT to test the machine's ability to package large quantities of decals had dimensions that differed from those specified by the plaintiff and had defects that caused them to change in shape.  The plaintiff never accounted for these variances, and Durham stuck to his mistaken belief that it was RT's contractual responsibility to make the machine work regardless of the condition of Brass Reminders' materials.  It may have been expensive for the plaintiff to die cut its materials so that they would actually conform to the specifications conveyed at the beginning of the project, but it was Brass Reminders' responsibility to do so or find some other way to account for the variances.

Further, the record establishes that the machine was functional during the May 2018 FAT.  The remaining issues related to the quality and inconsistent dimensions of the materials.

- 23 -

RT offered to pay for die cut materials to prove that the machine worked, but Durham interjected and told the cutting company not to die cut the materials for RT. Therefore, Brass Reminders is in breach of contract and RT is entitled to remainder of the contract price for the machine that appears to have conformed to its responsibilities under the contract.

Importantly, RT did not breach the contract itself. It makes the argument that Brass Reminders committed a *material* breach, presumably in an effort to avoid liability for its own nonperformance. *See RGJ Associates, Inc. v. Stainsafe, Inc.*, 338 F. Supp. 2d 215, 226 n. 24 (D. Mass. 2004) (indicating that in the UCC context, material breach excuses nonperformance by the other party and allows it to repudiate the contract and immediately sue for damages) (citations omitted). However, whether the breach was material is a nonissue because the record shows that RT continued to perform and successfully build the machine despite Brass Reminders' refusal to comply with its responsibilities as set out in the Terms and Conditions.

RT may have been at fault for the machine's "sweating" problem, but this was easily fixed in 2017 and did not cause a substantive delay in the machine's construction. Additionally, the Terms and Conditions actually protect RT from incurring liability for attempting to appease a customer who is in breach like Brass Reminders. They state that "[f]ailure on the part of Customer to meet any of its responsibilities may lead to delays in RT Engineering's performance or [its] inability to perform, for which RT Engineering will not be responsible." [Record No. 21-7, p. 5] And that is what happened here. Although the plaintiff's conduct did not result in the inability of RT to perform, it did result in the delayed construction of the machine and was ultimately the sole reason that Brass Reminders did not accept the finished product after the May 2018 FAT.

In summary, the record demonstrates that Brass Reminders breached the contract while RT performed.  As a result, summary judgment will be entered in RT's favor on the plaintiff's breach of contract claim as well as the defendant's counterclaim for the outstanding contract price, $40,659.75.[4]

## V.  The KCPA Claim

RT also argues that it is entitled to judgment as a matter of law on the plaintiff's KCPA claim because the good at issue, the decal packaging machine, was to be used for commercial purposes.  [Record No. 21-1, p. 21]  The KCPA establishes a right of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170 . . . ."  KRS § 367.220.  The decal packaging machine was to be used exclusively for Durham's business rather than personal purposes.  Therefore, the plaintiff cannot maintain a KCPA action, and the defendant is entitled to judgment as a matter of law on this count.

## VI.  Conclusion

The Terms and Conditions, as well as the provisions of the Quote, list the applicable terms for the contract at issue in this case.  Under these terms, Brass Reminders breached the contract while RT performed.  Additionally, the KCPA claim fails because the decal packaging machine was to be used for business purposes.

---

[4]     Although RT is entitled to summary judgment, the Court notes that it agrees with the defendant's alternative argument that the plaintiff is barred from recovering consequential damages.  The Terms and Conditions clearly prohibit Brass Reminders from recovering consequential damages.  The UCC as adopted in Massachusetts endorses such contractual limitations in commercial settings.  Mass. Gen. Laws. ch. 106 § 2-719(3).

Accordingly, it is hereby

**ORDERED** as follows:

1.      Defendant and Counter-Plaintiff RT Engineering Corp.'s motion for summary judgment [Record No. 21] is **GRANTED**.

2.      Summary judgment is entered in favor of Defendant and Counter-Plaintiff RT Engineering Corp. on Plaintiff and Counter-Defendant Brass Reminders Co., Inc.'s claims and the defendant and counter-plaintiff's counterclaim for the outstanding contract price.

3.      Plaintiff and Counter-Defendant Brass Reminders' claims are **DISMISSED**, with prejudice.

4.      A corresponding Judgment will be entered this date.

5.      The trial of this action, previously scheduled to begin on Monday, August 3, 2020, is **CANCELED**.

Dated:  May 28, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky